T.C. Memo. 1997-153


UNITED STATES TAX COURT


CLINTON N. AND NAOMI K. BOHANNON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20925-92.                    Filed March 26, 1997.


<u>S. Joseph Piazza</u> and <u>David L. Schick</u>, for petitioners.

<u>Willie Fortenberry, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes, an addition to tax, and a
penalty as follows:

| | | Addition to Tax | Penalty |
| Year | Deficiency | Sec. 6661 | Sec. 6662(d) |
| --- | --- | --- | --- |
| 1988 | $198,163 | $49,541 | -- |
| 1989 | 241,943 | -- | $48,389 |

After concessions, the issues for decision are:

(1)  Whether petitioners had enough of a basis in Bob Wade Ford, Inc. (Bob Wade Ford), to deduct losses of $256,752 in 1988 and $133,709 in 1989, as petitioners contend; had a zero basis, as respondent contends; or had a basis of some other amount; and, if petitioners establish that they had enough of a basis to deduct losses, whether passive loss limitations apply.  We hold that, after applying the passive loss limitations, petitioners may deduct $50,000 in 1988 and $52,692 in 1989.

(2)  Whether petitioners' net capital gains were $227,720 for 1988 and $244,489 for 1989, as petitioners contend, or $257,720 for 1988 and $274,489 for 1989, as respondent contends.  We hold that petitioners' net capital gains were $257,720 for 1988 and $274,489 for 1989.

(3)  Whether petitioners may carry forward net operating losses of $2,512,307 for 1988 and $2,401,099 for 1989.  We hold that they may not.

(4)  Whether petitioners may deduct expenses relating to a dirt fill operation of $127,985 for 1988 and $135,824 for 1989.  We hold that they may not.

(5)  Whether petitioners may claim a general business credit carryforward of $27,548 for 1988 and 1989.  We hold that they may not.

(6)  Whether petitioners are liable for the addition to tax for substantial understatement of income tax under section 6661

for 1988 and the accuracy-related penalty for substantial understatement of income tax under section 6662(d) for 1989. We hold that they are.

The parties agree that computational adjustments will be required for petitioners' medical expense deduction and Schedule A miscellaneous deductions and for petitioners' self-employment income for 1988 and 1989.

References to petitioner are to Clinton N. Bohannon. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners have lived in the Republic of Panama for 60 years, and they lived there when they filed the petition in this case. Petitioner worked for the Canal Authority for 18 years.

Petitioners' daughter is Gail Bohannon Wade (Gail Bohannon). Their former son-in-law is Bob Wade. The Wades lived in Clermont, Florida, during the years in issue. Scott Bohannon and Clinton Wade are petitioners' grandsons.

B. Bohannon, S.A.

When he stopped working for the Canal Authority in the mid-1950's, petitioner formed Bohannon, S.A., a Panamanian

corporation, to engage in shipping. Petitioner is the president of and is now a consultant for Bohannon, S.A. He has otherwise retired from active participation in the corporation.

Petitioner became a minority shareholder in Bohannon, S.A. in the mid-1960's. He owned bearer shares in Bohannon, S.A. that he later sold to the corporation.

Bohannon, S.A. owned ships. It did business worldwide, including hauling grain from Texas to Australia, hauling wastepaper, and transporting dry cargo. It did business mainly in Europe and North America. Company accountants kept records of Bohannon, S.A.'s income.

Bohannon, S.A. had a bank account in Panama. Petitioner had signature authority on the account.

Petitioners first reported that they sold Bohannon, S.A. stock on their 1982 return.

The United States invaded Panama on December 20, 1989.

C. <u>Bob Wade Ford, Inc.</u>

1. <u>Organization and Ownership</u>

Bob Wade Ford, Inc. (now South Lake Ford), a Ford dealership in Clermont, Florida, was organized on December 1, 1970. Clermont is about 20 miles west of Orlando. Bob Wade Ford sells new and used cars. It opened used car lots in Bushnell, Florida, in 1985, and Winter Garden, Florida, in 1986.

Bob Wade was the president of Bob Wade Ford at all times relevant here. Petitioner originally owned 80 percent of the stock of Bob Wade Ford. He became the 100-percent shareholder on December 31, 1983.

Bob Wade Ford was a C corporation until the end of 1975. It became an S corporation in 1976. Bob Wade Ford was an accrual method taxpayer.

2. Petitioners' Role in the Management of Bob Wade Ford

When petitioner traveled to the United States from Panama, he visited Bob Wade Ford and occasionally attended car auctions with Bob Wade. Petitioner did not attend management meetings, review the books, or do any work at the dealership. Petitioner was not knowledgeable about the automobile sales business. Mrs. Bohannon never worked at Bob Wade Ford.

3. Petitioners' Capital Contributions to Bob Wade Ford

In 1988, petitioner contributed $125,000 to Bob Wade Ford. His allocable share of its 1988 loss was $254,752. He contributed $275,000 in 1989, and his allocable share of the corporate loss was $133,709. Bohannon, S.A. provided $25,000 to Bob Wade Ford in 1989.

Petitioners deducted losses from Bob Wade Ford of $214,530 on their 1988 return and $105,767 on their 1989 return.

4. Bob Wade Ford's Tax Returns

No loans from shareholders were reported on Bob Wade Ford's tax returns (Forms 1120S) for 1979, 1980, 1981, 1982, 1983, 1984,

1985, and 1986. Loans from shareholders of $925,049 were reported on the 1987 corporate return. No loans from shareholders were reported on the 1988 and 1989 corporate returns.

Bob Wade Ford never made a profit. Bob Wade Ford reported losses on its Forms 1120S (S corporation tax returns) and Schedule K-1 losses allocated to petitioner and Wade from 1976 to 1989 as follows:

| | Losses per | K-1 losses were allocated to: | |
| Year | tax return | Petitioner | Wade |
| --- | --- | --- | --- |
| 1976 | ($114,476) | ($91,581) | -- |
| 1977 | (118,690) | (90,204) | |
| 1978 | (191,025) | (145,179) | |
| 1979 | (734,701) | (587,761) | ($146,940) |
| 1980 | (474,239) | (379,391) | (94,848) |
| 1981 | (347,016) | (312,315) | (34,701) |
| 1982 | (467,196) | (420,476) | (46,720) |
| 1983 | (159,044) | (143,140) | (15,904) |
| 1984 | (942,985) | (942,985) | -- |
| 1985 | (642,216) | (642,216) | -- |
| 1986 | (322,096) | (322,096) | -- |
| 1987 | (122,976) | (122,976) | -- |
| 1988 | (256,752) | (256,752) | -- |
| 1989 | (133,709) | (133,709) | -- |
| Total | (5,027,121) | (4,590,781) | |

Losses were allocated between petitioner and Wade on the basis of the following ownership ratios:

| Years | Petitioner | Wade |
| --- | --- | --- |
| 1976-81 | 80% | 20% |
| 1982-83 | 90 | 10 |
| 1984-89 | 100 | 0 |

Gary Kane (Kane), a certified public accountant (C.P.A.) for 24 years, prepared tax returns for Bob Wade Ford beginning in

1976 and for all years relevant here.  Kane also prepared petitioners' amended 1981 return.  He was petitioners' representative in two Internal Revenue Service audits.

Respondent audited Bob Wade Ford's 1988 and 1989 tax returns late in 1990 or early in 1991.  Kane prepared a schedule of petitioner's basis in Bob Wade Ford from 1976 to the end of 1993 for that audit.

D.    Petitioners' Loans to the Wades

Gail Bohannon and Bob Wade gave promissory notes to petitioners as follows:

| Date | Amount |
|------|--------|
| Jan. 21, 1985 | $96,954.03 |
| Jan. 30, 1986 | 5,633.11 |
| Feb. 1, 1986 | 23,205.00 |
| Feb. 17, 1986 | 4,600.00 |
| Mar. 14, 1986 | 4,350.00 |
| Mar. 19, 1986 | 2,500.00 |
| Apr. 21, 1986 | 4,000.00 |
| May 7, 1986 | 6,000.00 |
| May 16, 1986 | 200,000.00 |
| June 6, 1986 | 3,860.00 |
| June 11, 1986 | 500.00 |
| July 1, 1986 | 4,340.00 |
| July 29, 1986 | 35,205.00 |
| July 30, 1986 | 4,400.00 |
| Aug. 29, 1986 | 11,859.37 |
| Sept. 3, 1986 | 1,800.00 |
| Sept. 10, 1986 | 4,415.00 |
| Sept. 27, 1986 | 148,123.53 |
| Total | 561,745.04 |

E.    The Citrus Grove/Dirt Fill Operation

Petitioners reported expenses of $127,985 in 1988 and $135,824 in 1989 from a dirt fill operation conducted on 112

acres of property owned by the Dennis Horton Trust 101 in Clermont, Florida. The land contained citrus groves when Bob Wade bought an interest in it. There was no citrus production from the property after a freeze in 1983. After citrus production ceased, Wade sold dirt from the property to the State of Florida for highway construction.

Petitioner invested in the Dennis Horton Trust 101 on September 11, 1984. The Dennis Horton Trust 101 balance sheet for December 31, 1989, showed that the trust had given petitioner notes payable in the amount of $2,211,268.84.

Petitioner occasionally visited the dirt fill operation with Wade, but did not do any work for it in 1988 or 1989. Wade obtained the permits, arranged for design work, and did all of the other work for the dirt fill operation. Petitioner spent no more than 30 hours at the dirt fill site in 1988 and 1989.

F.   Petitioners' Family Trips and Other Family Expenses

Petitioner often took his family on expensive trips. They went to Vietnam, Australia, New Zealand, South Africa, Hawaii, Europe, Russia, China, and Hong Kong. Petitioner took Gail Bohannon to Australia, New Zealand, Samoa, Fiji, and Hawaii for 36 days in 1972. Sometime between 1972 and 1990, he took Scott Bohannon and Scott's girlfriend to China for a month. He paid for Scott's and Scott's girlfriend's trip to South Africa. He also

took his family (including the Wades) on a train trip from Holland to Hong Kong.

From 1980 to 1989, petitioner paid his grandchildren's private school expenses and paid for Scott's college, law school, and other graduate work. He also bought new cars for his grandchildren.

G.    Petitioners' Tax Returns

Petitioners reported adjusted gross income/(loss), net operating losses, and tax liability from 1973 to 1992 as follows:

| Year | AGI per return | NOL reported on return | Tax liability |
|------|----------------|------------------------|---------------|
| 1973 | $17,839 | -- | $237 |
| 1974 | 14,769 | -- | 75 |
| 1975 | 22,503 | -- | 188 |
| 1976 | (71,322) | -- | -0- |
| 1977 | Not in record | -- | N/A |
| 1978 | (262,837) | -- | -0- |
| 1979 | (794,993) | ($262,837) | -0- |
| 1980 | (1,023,618) | (794,993) | -0- |
| 1981 | Not in record | -- | N/A |
| 1982 | (1,325,376) | (1,342,640) | -0- |
| 1983 | (1,359,420) | (1,325,376) | -0- |
| 1984 | (2,024,617) | (1,325,376) | -0- |
| 1985 | (3,106,064) | (1,821,448) | -0- |
| 1986 | (2,801,590) | (2,818,172) | -0- |
| 1987 | (2,457,106) | (2,479,613) | -0- |
| 1988 | (2,330,427) | (2,512,307) | -0- |
| 1989 | (2,162,888) | (2,401,099) | -0- |
| 1990 | (2,132,242) | (2,242,047) | -0- |
| 1991 | (2,227,894) | (2,216,612) | -0- |
| 1992 | (2,014,686) | (2,308,249) | -0- |

Petitioner reported wages of $89,765 for 1982, $90,438 for 1983, $86,965 for 1984, $87,845 for 1985, $88,764 for 1986, zero for 1987 and 1988, and $94,915 for 1989. He has no records showing whether he received wages from Bohannon, S.A.

Petitioners reported income from the sale of Bohannon, S.A. stock from 1973 to 1989 as follows:

| Year | Income from Sale of Bohannon, S.A. Stock Reported on Petitioners' Return |
|------|---------------------------------------------------------------------------|
| 1973 | -0- |
| 1974 | -0- |
| 1975 | -0- |
| 1976 | -0- |
| 1977 | Not in record |
| 1978 | -0- |
| 1979 | -0- |
| 1980 | -0- |
| 1981 | Not in record |
| 1982 | $875,000 |
| 1983 | -0- |
| 1984 | 397,673 |
| 1985 | 793,816 |
| 1986 | 642,972 |
| 1987 | -0- |
| 1988 | 218,000 |
| 1989 | 219,500 |
| Total | 3,146,961 |

A general business credit was reported on petitioners' Forms K-1 from 1976 to 1985. Petitioners attached Forms 3800, General Business Credit, to their 1988 and 1989 returns. On them, petitioners reported but did not claim a $27,548 carryforward of the general business credit for 1988 and 1989.

Petitioners reported gains from the sale of stock of Bohannon, S.A. ($875,000) and Hardwoods, S.A. ($287,100) on their 1982 return. Hardwoods, S.A. was another Panamanian corporation in which petitioner owned stock. Petitioners made no section 172(d) computations on their 1982 return.

Kane and petitioner both prepared 1985 returns for petitioners. The return Kane prepared showed that petitioner had no wages. Petitioner received the return Kane had prepared, and then prepared and filed a different tax return as petitioners' joint return. Petitioner reported wages of $87,845 and interest income of $93,131 on the return he filed for 1985. In 1985, petitioner bought U.S. Treasury bonds that paid interest of $79,375. In 1988 and 1989, petitioner included parts of the returns prepared by Kane in the returns he prepared and filed as petitioners' joint returns.

On their tax returns for 1990, 1991, and 1992, petitioners reported gains from the sale of Bohannon, S.A. stock of $219,500 for 1990, $109,500 for 1991, and $218,000 for 1992.

Petitioner gave Kane handwritten notes or oral information about his basis in the Bohannon, S.A. stock that he reported he sold on his 1988 return. Petitioner did not give Kane a copy of contracts of sale or income or expense statements showing that he had bought or sold Bohannon, S.A. stock. Petitioner gave Kane no documents relating to the sale of Bohannon, S.A. stock in 1989, 1990, and 1991. Petitioner gave Kane brokerage statements showing that petitioner sold some publicly traded stocks.

Petitioner gave Kane no Forms W-2 or payroll records relating to his salary from Bohannon, S.A.

OPINION

A.  Whether Petitioner Had A Sufficient Basis in Bob Wade Ford To Claim Losses From the Corporation in 1988 and 1989

   1.   Petitioner's Basis in Bob Wade Ford in 1988 and 1989

Petitioner was the sole shareholder of Bob Wade Ford, a subchapter S corporation in 1988 and 1989.  Petitioners deducted losses of Bob Wade Ford under section 1366(a).  To be entitled to deduct the losses, petitioners must show that Bob Wade Ford sustained losses in the relevant years and that petitioners had a basis in Bob Wade Ford in 1988 and 1989 at least equal to the amount of the losses.  Sec. 1366(d)(1).

A shareholder's deduction of losses from a subchapter S corporation is limited to his or her adjusted basis in (a) stock in the corporation and (b) debt owed by the corporation to the shareholder.  Sec. 1366(d)(1).  A taxpayer's share of any S corporation loss in excess of his or her adjusted basis may be carried over indefinitely.  Sec. 1366(d)(1) and (2).  A loan from a shareholder to an S corporation increases the shareholder's basis if the shareholder makes an economic outlay and directly incurs the indebtedness.  Sec. 1366(d)(1)(B); Harris v. United States, 902 F.2d 439, 442-443 (5th Cir. 1990); Estate of Leavitt v. Commissioner, 875 F.2d 420, 422-423 (4th Cir. 1989), affg. 90 T.C. 206 (1988); Hitchins v. Commissioner, 103 T.C. 711, 714-715 (1994); Underwood v. Commissioner, 63 T.C. 468, 476 (1975), affd. 535 F.2d 309 (5th Cir. 1976).  A loan from a shareholder's wholly

13

owned C or S corporation to a wholly owned S corporation does not increase the shareholder's basis in the S corporation. Meissner v. Commissioner, T.C. Memo. 1995-191; Burnstein v. Commissioner, T.C. Memo. 1984-74.

Respondent argues that petitioner has not proven the amount of his basis in Bob Wade Ford. We agree in part and disagree in part. We find that petitioner invested $125,000 in Bob Wade Ford in 1988 and $275,000 in 1989. Petitioner produced canceled checks showing his contributions to the dealership in 1988 and 1989 and records of his Merrill Lynch money market account that showed petitioner's contributions to Bob Wade Ford for 1988. Petitioners reported gains from sales of Bohannon, S.A. stock on their 1988 and 1989 returns exceeding the amount they invested in Bob Wade Ford in those years.

However, petitioner did not prove that he had a basis in Bob Wade Ford at the end of 1987. Petitioner testified that he has contributed his own funds to the dealership each year since 1970, except in 1990. He testified that he kept annual summaries of his contributions and gave them to Kane. Kane testified that petitioner's basis in Bob Wade Ford was $1,079,854 in 1988 and $1,272,953 in 1989. Kane and Dan Gallogly, a certified public accountant, both testified that they calculated petitioner's basis in Bob Wade Ford. Petitioner produced canceled checks and records of his Merrill Lynch money market account showing that he made some contributions to the dealership before 1988. These

support petitioner's claim that he contributed to Bob Wade Ford before 1988. Although petitioner claims that he contributed $5,763,262 to Bob Wade Ford from 1976 to 1989, his records such as canceled checks and Merrill Lynch money market account statements fall short of establishing that amount. Bob Wade Ford reported losses of $4,636,660 from 1976 to 1987 ($4,200,320 of which was allocated to petitioner in those years); petitioner's records do not establish that he contributed more than $4,200,320 from 1976 to 1987 such that he would have a basis in Bob Wade Ford at the end of 1987. Petitioner has not established that he had any basis in the dealership at the end of 1987. Since petitioner did not establish that he had a basis in Bob Wade Ford at the end of 1987, his share of the dealership's loss for 1988 is limited to the amount he contributed in 1988 ($125,000). Sec. 1366(d)(1). Petitioner's share of Bob Wade Ford's loss for 1988 in excess of his adjusted basis is carried over to 1989. Sec. 1366(d)(2).

2.   Bob Wade Ford's Losses in 1988 and 1989

Bob Wade Ford reported losses of $256,752 in 1988 and $133,709 in 1989. Respondent contends that petitioners may not deduct losses for 1988 based on journal entry No. 2 ($31,789), journal entry No. 7 ($24,000), and check No. 20862 ($2,000).[1]

---

[1] The item for 1989 is a timing adjustment. The parties agree that, if journal entry No. 7 is disallowed for 1988, then a $24,000 deduction is allowed in 1989.

a.     Journal Entry No. 2

Respondent contends that journal entry No. 2 is incorrect. Journal entry No. 2 increased the cost of new cars by $10,000 and used cars by $21,789 and credited the allowance for doubtful accounts (a "contra account")[2] by $31,789.  Respondent argues that petitioners have not shown that these amounts were correct. Respondent contends that amounts in the contra account had already reduced income, and that reducing this account at yearend resulted in a double reduction of income.  Respondent contends that this adjustment should have been made for 1987, not 1988. We disagree.

Kane made journal entry No. 2 to correct an entry erroneously made by the dealership's bookkeeper to a nonexistent account called "allowance for doubtful accounts".  The bookkeeper should have made the entry to the expense account.  Journal entry No. 2 corrected this error.  It did not affect the dealership's taxable income.

Respondent has offered no support for the contention that journal entry No. 2 should have been made in 1987.  Bob Wade Ford

---

[2] A contra account is the functional equivalent of a reserve for a bad debt.  See Thor Power Tool Co. v. Commissioner, 64 T.C. 154, 156 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979); Hutton v. Commissioner, 53 T.C. 37, 39 (1969).

had already included uncollected receivables in income, so writing off the receivables reduced income only once.

### b.   Journal Entry No. 7

Respondent contends that journal entry No. 7 (a $24,000 deduction) should be made for 1989 rather than 1988 because (1) the adjustment is for an inventory item, which reduces the beginning inventory for 1989 and the cost of goods sold for 1989 by a like amount; (2) petitioners did not establish the events and nature of the transactions which necessitated the inventory writedown at the end of 1988; and (3) the writedown is proper under the cost method of inventory accounting.  We disagree.

Kane made journal entry No. 7 to reduce the fair market value of 28 used cars to the lower of cost or market, which was the dealership's method of inventory.  This adjustment properly reduced the dealership's income by $24,000 in 1988 and increased its income by that amount in 1989.

### c.   Check No. 20862

Respondent contends that a deduction for check No. 20862 for $2,000 should be disallowed because petitioners failed to establish that Bob Wade Ford incurred the expense as an ordinary and necessary business expense.

Petitioners offered a journal entry of $2,000 and Kane's testimony.  Wade told Kane he had cashed check No. 20862 to pay cash bonuses to employees at Christmas.  Petitioners point out that Wade was called by respondent to testify and that although

his relationship to petitioners was adverse by the time of trial, he did not dispute Kane's testimony. Petitioners, however, bear the burden of proving that the $2,000 expense was an ordinary and necessary business expense, and they did not ask Wade about this issue.

Kane testified that he did not know whether Bob Wade Ford issued Forms W-2 to employees for the bonuses. Petitioners have not proven that Bob Wade Ford is entitled to deduct this amount because petitioners had no Forms W-2 or other evidence corroborating that Bob Wade paid the $2,000 to employees. Bob Wade Ford's loss for 1988 is thereby decreased by $2,000.

### d. Conclusion

We conclude that Bob Wade Ford had losses of $254,752 in 1988 and $133,709 in 1989.

### 3. Passive Loss Limitations: Whether Petitioner Materially Participated in the Management of Bob Wade Ford

The next issue for decision is whether the losses petitioners claimed from Bob Wade Ford are passive activity losses under section 469. More specifically, we must decide whether petitioner materially participated in the business of Bob Wade Ford.

Individuals generally may not deduct losses from a passive activity. Sec. 469(a). A passive activity is a trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). An individual materially participates in an

activity only if he or she is regularly, continuously, and substantially involved in its operations. Sec. 469(h)(1). The regulations contain seven safe harbors under which an individual is deemed to materially participate in an activity. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).

A taxpayer materially participates in an activity if he or she participates in the activity for more than 500 hours during the year. Sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra. Petitioners contend that petitioner meets that test.[3] Petitioner testified that he spent about 400-500 hours participating in the operations of the corporation. Larry Ragar (Ragar), the used car manager at Bob Wade Ford in 1988 and 1989 and now at South Lake Ford, testified that petitioner worked more than 500 hours at the dealership in each of the years 1988 and 1989.

Petitioner's and Ragar's testimony that petitioner worked as much as 500 hours at the dealership during the years at issue is not credible. Wade, the president of Bob Wade Ford during the years in issue, testified that petitioner had no duties or responsibilities at the dealership. Petitioner has lived in Panama for more than 60 years. Petitioner never managed the dealership or did any selling or buying, bookkeeping, payroll, or

---

[3] Petitioners concede that Mrs. Bohannon did not materially participate in the operations of Bob Wade Ford in 1988 and 1989.

supervisory work. Petitioner said that he was primarily an investor in Bob Wade Ford and that he attended board meetings. His testimony that he worked 400-500 hours each year at the dealership was not credible.

We conclude that petitioner did not materially participate in the management of Bob Wade Ford in 1988 and 1989. However, under the phase-in provided by section 469(m)(2), he may deduct $50,000 in 1988 (40 percent of his share of the dealership's loss in 1988 ($125,000))[4] and $52,692 in 1989 (20 percent of his share of the dealership's loss in 1989 ($133,709) plus the section 1366(d)(2) carryover from 1988 ($129,752)).

B. <u>Petitioners' Deductions From the Dirt Fill Operation</u>

Petitioners reported losses of $127,985 for 1988 and $135,824 for 1989 from a dirt fill business conducted on property owned by the Dennis Horton Trust 101. Petitioners contend that they offered credible evidence to support their claimed losses and that respondent offered no contrary testimony or evidence.

We disagree. A taxpayer must keep records that are sufficient to enable the Commissioner to determine his or her correct tax liability. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. A taxpayer who claims a deduction bears the burden of

---

[4] As discussed at par. A-1, above, this amount takes into account that petitioner's share of the dealership's loss for 1988 is limited to $125,000, the amount he contributed in 1988. Petitioner's share of the dealership's loss in excess of that amount ($129,752) is carried over to 1989. Sec. 1366(d)(2).

substantiating the amount and purpose of the item claimed. Sec. 1.6001-1(a), Income Tax Regs.

Petitioners did not have books and records to support their deduction of these expenses. Petitioners have not proven that they paid the expenses or that the expenses were made for a business purpose. Interest expenses make up $108,576 of the $127,985 claimed for 1988 (84 percent) and $96,693 of the $135,824 claimed for 1989 (71 percent), yet petitioners provided no evidence that they had any indebtedness relating to the dirt fill operation.

Kane obtained the amounts to report as income and deductions from the dirt fill operation from the trustee's listing of cash receipts and disbursements; however, those records are not in evidence. Petitioners produced no bills or checks to substantiate the claimed expenses.

Petitioners offered no credible evidence to substantiate their claimed expenses from the dirt fill operation for 1988 and 1989. Thus, we sustain respondent's disallowance of these expenses.

C.   Capital Gains From Sales of Stock in Bohannon, S.A.

Petitioners claimed that their basis in the Bohannon, S.A. stock they sold in 1988 was $30,000, and $30,000 for the stock they sold in 1989. Respondent disallowed petitioners' claimed bases in their Bohannon, S.A. stock because petitioners did not substantiate these amounts.

Petitioner maintains that his Bohannon, S.A. investment records were destroyed in the riots following the United States' invasion of Panama in December 1989. Clinton Wade testified that petitioner told him (in a phone call during the riots) that the floor where petitioner's office was located had been ransacked. Petitioner also contends that his testimony is sufficient since it is uncontroverted and is supported by respondent's handling of earlier audits.

We disagree. We are not convinced that petitioner's records were destroyed in riots after the December 1989 U.S. invasion of Panama. Petitioner offered no corroboration such as photographs of damaged premises. More importantly, petitioner apparently did not try to reconstruct his records from other sources. A taxpayer's inability or refusal to produce records does not relieve him or her of the burden of proof. Figueiredo v. Commissioner, 54 T.C. 1508, 1511-1512 (1970), affd. per order 73-2 USTC par. 9713 (9th Cir. 1973). When a taxpayer's records have been lost or destroyed, the taxpayer may substantiate deductions through other credible evidence. E.g., Williams v. Commissioner, T.C. Memo. 1994-275; Thorpe v. Commissioner, T.C. Memo. 1992-160. Petitioners apparently did not try to do so. Finally, petitioners first reported that they had sold Bohannon, S.A. stock in 1982. The earlier audits were of their 1976 and 1980 returns, so those earlier audits do not support this claim.

Petitioner testified that he initially invested $10 per share, and that he did not know how much he invested or where he got the funds to invest. Petitioner's testimony was evasive, vague, and not credible. He seemed to have selective recall. He was inexplicably unable to remember basic details about his investment in Bohannon, S.A., when it was incorporated, the identity of its initial shareholders,[5] and how he set the selling price of his stock. Petitioner testified that he did not know where Bohannon, S.A. is located or how the corporate bills were paid, despite the fact that he said he incorporated it and that he is president of the corporation and was a major shareholder until the mid-1960's. We need not accept self-serving testimony. Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Kane saw no records of petitioner's stock sale or basis in the stock; he saw only petitioner's handwritten notes.

Petitioners submitted no documentary evidence at trial to establish their basis in Bohannon, S.A. Under these circumstances, we do not consider petitioner's estimate of basis.

---

[5] Bob Wade testified that petitioner incorporated Bohannon, S.A. with Mrs. Bohannon's father and brother. We find it incredible that petitioner cannot remember with whom he incorporated the corporation.

We find that petitioners have not established their basis in the Bohannon, S.A. stock they sold in 1988 and 1989. We sustain respondent on this issue.

D. Net Operating Loss Carryforward

Respondent determined that petitioners may not deduct net operating losses carried forward to 1988 and 1989 because petitioners did not establish the amount of the losses or that the losses had not been absorbed in prior years. Petitioners bear the burden of proving that they had net operating losses from 1982 to 1987. Rule 142(a); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955). Petitioners must prove the amount of the net operating loss carryforward and that the losses were not absorbed by their gross income in those years. Sec. 172(c); Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), revd. and remanded on other grounds 259 F.2d 300 (5th Cir. 1958); Vaughan v. Commissioner, 15 B.T.A. 596, 600 (1929).

Respondent contends that petitioners had unreported income before 1988, that petitioners may not deduct a casualty loss in 1985, and that petitioners may not exclude income under section 911 from 1982 to 1989. Petitioners argue that because respondent first raised these issues at trial, we should not consider them. We need not decide this issue because petitioners did not prove that they had deductions in excess of their reported income from 1982 to 1987, even if we do not consider whether they had

unreported income before 1988 and even if we assume that they could deduct a casualty loss and exclude income under section 911.

Petitioner testified that petitioners' returns for 1982 to 1989 were true and correct. His testimony does not convince us that petitioners are eligible for net operating loss carryforwards to 1988 and 1989. A tax return does not establish the correctness of the facts stated in it. Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957); see Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974). As we stated above, petitioner's testimony was often evasive, vague, and not credible, yet petitioners ask us to accept (without any records) his testimony that their tax returns for 10 to 15 years were true and accurate. We are not bound to accept the testimony of a taxpayer under these circumstances. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Kane testified that petitioners' net operating loss carryover was $1,706,535 at the end of 1988 and $1,555,655 at the end of 1989. He did not testify about the net operating loss carryover available at the end of 1987. The only indication of the net operating loss carryforward to 1988 is the amount petitioners claimed on their 1988 return. Kane's worksheets

regarding the net operating loss carryovers were not offered into evidence. We have only his testimony about the net operating loss calculations. He did not explain how he computed petitioners' net operating loss carryforward, or why he computed net operating loss carryforwards different from those claimed ($2,512,307 for 1988 and $2,401,099 for 1989) on petitioners' returns for 1988 and 1989. His general testimony that petitioners' and Bob Wade Ford's returns are true and correct does not establish that petitioners had net operating loss carryforwards for 1988 and 1989.

We agree with respondent on this issue because petitioners did not show that they had net operating losses from 1982 to 1987 or that those losses were not absorbed in prior years. See McWilliams v. Commissioner, T.C. Memo. 1995-454 (Court rejected taxpayers' claimed carryover losses since they did not show that the losses were not absorbed in prior years).

E.   General Business Credit

Petitioners reported but did not claim a $27,548 carryforward of the general business credit on their 1988 and 1989 returns. Kane testified that the general business credit reported on petitioners' 1988 and 1989 returns was a carryforward of petitioners' distributive share of investment tax credits reported by Bob Wade Ford.

Petitioners argue that they established that the general business credit arose from Bob Wade Ford's purchase of assets qualifying for the investment tax credit.  We disagree; petitioners have not identified the property for which the credit was claimed or established that the property was qualified property.  Sec. 38(a).  We sustain respondent on this issue.

F.    Substantial Understatement of Income Tax

The next issue for decision is whether petitioners are liable for the addition to tax under section 6661(a) for 1988 and the accuracy-related penalty under section 6662(d) for 1989 for substantial understatement of income tax.  Section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax.  The accuracy-related penalty equals 20 percent of any part of an underpayment attributable to a substantial understatement of income tax.  Sec. 6662(a) and (b)(2).

An understatement is the amount by which the correct tax exceeds the tax reported on the return.  Sec. 6661(b)(2)(A).  An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Secs. 6661(b)(1)(A) and 6662(d)(1)(A).  Petitioners bear the burden of proving that they are not liable for the addition to tax under section 6661(a) and the accuracy-related penalty

imposed by section 6662(a).  Rule 142(a); <u>Tweeddale v. Commissioner</u>, 92 T.C. 501, 506 (1989).

Petitioners argue that they are not liable for the addition to tax under section 6661(a) and the accuracy-related penalty under section 6662(d) because they did not understate their tax on their 1988 and 1989 returns.  We disagree for reasons given above.

Petitioners argue that section 6662 was first effective for tax years beginning after December 31, 1989.  We disagree. Section 6662 applies to returns due after December 31, 1989. Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), 103 Stat. 2106, 2395.  This includes petitioners' 1989 return.

If a taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable to it.  Sec. 6661(b)(2)(B)(i).  The amount of the understatement is reduced for any item adequately disclosed on the taxpayer's return or in a statement attached to the return.  Sec. 6661(b)(2)(B)(ii).  The accuracy-related penalty does not apply to any part of an underpayment for which there was reasonable cause and with respect to which the taxpayer acted in good faith.  Sec. 6664(c). Petitioners do not contend that these exceptions apply here.  We conclude that petitioners are liable for the section 6661(a)

addition to tax for 1988 and the section 6662(d) accuracy-related penalty for 1989.

<u>Decision will be entered</u>

<u>under Rule 155.</u>