J.H. HARRIS, and William J. Martin,
Plaintiffs–Appellants,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 89–3024.

United States Court of Appeals,
Fifth Circuit.

June 7, 1990.

Warren M. Schultz, Jr., Alexander P. Trostorff, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiffs-appellants.

Teresa E. McLaughlin, Gary R. Allen, Richard Farber, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., John P. Volz, U.S. Atty., Eneid Francis, Asst. U.S. Atty., New Orleans, La., Paul M. Predmore, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this federal income tax refund suit, plaintiffs-appellants, J.H. Harris (Harris) and William J. Martin (Martin), collectively Taxpayers, appeal the district court's summary judgment in favor of defendant-appellee, the United States (Government). We affirm.

### Facts and Proceedings Below

In June 1982, Taxpayers contracted with Trans–Lux New Orleans Corporation to purchase for $665,585 cash a New Orleans pornographic theater that they intended to convert into a wedding hall. The Taxpayers' obligations under the contract were conditioned on their being able to secure from a third party a loan for not less than $600,000 repayable in fifteen to twenty years.[1] Shortly before this time, Taxpayers had contacted John Smith (Smith), a real estate loan officer with Hibernia National Bank (Hibernia), to discuss the possibility of obtaining financing for the impending acquisition. Smith orally committed to lend Taxpayers $700,000.[2]

Subsequently, to shield themselves from the potential adverse publicity that could follow from the purchase of the pornographic theater, as well as to limit their personal liability and enhance their chances of qualifying for industrial revenue bonds to finance the theater's renovation, in July 1982 Taxpayers formed Harmar (Harmar), a Louisiana corporation, which elected to be taxed pursuant to Subchapter S of the Internal Revenue Code, to purchase and operate the subject property. Harris and Martin each initially contributed $1,000 to the corporation, receiving its stock in return, and each also loaned Harmar $47,500 to satisfy operating expenses. Harris and Martin were the sole shareholders of Harmar, each owning half of its stock.

The purchase of the theater closed on November 1, 1982, and the theater was conveyed to Harmar on that date. Hibernia furnished the $700,000 necessary to close the transaction.[3] In borrowing the funds necessary to acquire the subject property, Harmar executed two promissory notes payable to Hibernia for $350,000 each, each dated November 1, 1982. One of these notes was secured by a $50,322.09 Hibernia certificate of deposit in Harris' name and another $304,972.49 certificate of deposit in the name of his wholly-owned corporation, Harris Mortgage Corporation. Harmar secured the other note, in accordance with its collateral pledge agreement, by its $3,000,000 note (which was unfunded apart from the $700,000) and its collateral mortgage on the theater, each executed by Harmar in favor of Hibernia and dated November 1, 1982. Under the terms of the collateral pledge agreement executed by Harmar in reference to the $3,000,000 note and mortgage, the mortgage secured "not only" Harmar's $350,000 note to Hibernia, "but also any and every other debts, liabilities and obligations" (other than consumer credit debt) of Harmar to Hibernia whether "due or to become due, or whether such debts, liabilities and obligations" of Harmar "are now existing or will arise in the future." Thus, the collateral mortgage secured the full $700,000 loan from Hibernia. Additionally, Taxpayers each executed personal continuing guarantees of Harmar indebtedness in the amount of $700,000 in favor of Hibernia. Smith testified in his deposition that the transaction was structured so that half the loan, as represented by one of the $350,000 notes, would be primarily secured by the certificates of deposit and the other half, represented by the other $350,000 note, primarily by the mortgage on the property purchased, with the entire amount also secured by Taxpayers' individual guarantees.

On its income tax return for the year ending December 31, 1982, Harmar report-

---

1. As part of the contract, Taxpayers deposited with the seller $32,500, all of which was to be applied to the purchase price. In the event Taxpayers were unable to procure the loan, the purchase contract called for their deposit to be refunded.

2. Smith asserted in his deposition that he did not know the purpose of the borrowed funds in excess of the purchase price, but he surmised that the money was intended for improvements to the theater. No written loan commitment was ever issued.

3. As noted, the purchase price was $665,585. Harris testified in his deposition that at closing there was also paid some $10,000 in miscellaneous closing costs and a $35,000 real estate commission, so "the entire $700,000 was accounted for at the closing." It is unclear whether the $32,500 escrow previously deposited by the Taxpayers with the seller was wholly or partially refunded to them or was credited to Harmar. Harmar's 1982 income tax return shows that as of December 31, 1982, it had land and buildings with an original cost of $674,367.

ed a net operating loss of $104,013. Pursuant to section 1374 of the Internal Revenue Code of 1954[4], Taxpayers each claimed half of the loss as a deduction on their 1982 individual returns[5], concluding that their bases in Harmar were in fact greater than Harmar's net operating loss for that year and that they therefore were entitled to deduct the entire loss on their personal returns. On audit, the Internal Revenue Service (IRS) found to the contrary and determined that Harris and Martin each had a basis of $1,000 in his Harmar stock and an adjusted basis in Harmar's indebtedness to each of them as shareholders of $47,500. Pursuant to I.R.C. § 1374(c)(2), the IRS limited Taxpayers' deductions of the net operating loss to what it considered to be their bases in Harmar, $48,500 each. The IRS's disallowance of a portion of the deductions claimed by Taxpayers[6] resulted in additional tax liability, including interest,

for Martin of $3,150.58 and for Harris of $1,280. Taxpayers paid the tax in dispute and now appeal the district court's summary judgment dismissing their suit for refund.

## Discussion

■ Taxpayers contend on appeal that in determining the deduction allowable for Harmar's net operating loss, the IRS should have included in Taxpayers' bases in their Harmar stock the full value of the $700,000 Hibernia loan they guaranteed. I.R.C. § 1374 permits a Subchapter S shareholder to deduct from his personal return a proportionate share of his corporation's net operating loss to the extent that the loss does not exceed the sum of the adjusted basis of his Subchapter S corporation stock and any corporate indebtedness

4. Except as otherwise indicated, references herein to the Internal Revenue Code (I.R.C.) are to the Internal Revenue Code of 1954. For the tax year in question, I.R.C. § 1374 provided, in relevant part:

"SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS
"(a) GENERAL RULE.—A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.
"(b) ALLOWANCE OF DEDUCTION.—Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). The deduction allowed by this subsection shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder.
"(c) DETERMINATION OF SHAREHOLDER'S PORTION.—
" . . . .
"(2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—
"(A) the adjusted basis (determined without regard to any adjustment under section 1376

for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and
"(B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation)."

In 1982, Congress revised the rules concerning Subchapter S corporations in the Subchapter S Revision Act of 1982, Pub.L. 97–354, 96 Stat. 1669. However, the revisions are not applicable in this case because they concern only taxable years beginning after December 31, 1982. Sec. 6(a), Subchapter S Revision Act of 1982, Pub.L. 97–354, 96 Stat. 1669, 1697 (1982). This case concerns only the year ending December 31, 1982.

We also observe that the limitations provided in former § 1374(c)(2) by section 2 of the Subchapter S Revision Act of 1982 were subsequently reenacted in § 1366(d)(1). That section is currently in effect.

5. Harris and Martin claimed deductions for Harmar's loss of $52,006 and $52,007, respectively.

6. The IRS disallowed $4,506 of Harris' deduction and $4,507 of Martin's.

to him. *See* section 1374(c)(2) (now section 1366(d)(1)). To arrive at their basis figure, Taxpayers seek to recast the transaction in question. They in essence urge that we disregard the form of the Hibernia loan— one from Hibernia to Harmar—in favor of what Taxpayers consider as the substance of the transaction—a $700,000 loan from Hibernia to them, the $700,000 proceeds of which they then equally contributed to Harmar's capital account. As evidence of their view of the substance of the transaction, Taxpayers point to the deposition testimony of Smith indicating that Hibernia looked primarily to Taxpayers, rather than to Harmar, for repayment of the loan, and they call attention to the $700,000 guarantees they each provided Hibernia as well as the $355,294.58 in certificates of deposit that Harris pledged to Hibernia as part of the November 1, 1982 loan transaction.

In its summary judgment memorandum, the district court declared that *Brown v. Commissioner*, 706 F.2d 755 (6th Cir.1983), was "on all fours" with the instant case and therefore resolved it. In *Brown*, the Sixth Circuit rejected shareholders' substance over form argument in ruling that the shareholders' guarantees of loans to their Subchapter S corporation could not increase their bases in their stock in the corporation unless the shareholders made an economic outlay by satisfying at least a portion of the guaranteed debt. *Id.* at 757. Without such an outlay, the *Brown* court concluded that "'the substance matched the form'" of the transaction before it. *Id.* at 756. The reasoning of *Brown* was followed by the Fourth Circuit in *Estate of Leavitt v. Commissioner*, 875 F.2d 420 (4th Cir.1989), *aff'g*, 90 T.C. 206 (1988). There, the court, affirming the en banc Tax Court, held that shareholder guarantees of a loan to a Subchapter S corporation did not increase shareholders' stock basis because such guarantees had not "cost" shareholders anything and thus did not constitute an economic outlay. *Leavitt*, 875 F.2d at 422 & n. 9.[7] In reaching this conclusion, the Fourth Circuit affirmed as not clearly erroneous a finding of the Tax Court that the loan, in form as well as in substance, was made to the corporation rather than to the shareholders.[8] *Id.* at 424. The court rejected appellants' suggestion that it employ the debt/equity principles espoused in *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712 (5th Cir.1972), in determining whether the shareholders had actually made an economic outlay,[9] instead choosing to employ a

---

7. In reasoning that the shareholders had not increased their stock bases as a result of their guarantees, the court turned to I.R.C. § 1012, which defines basis of property as its cost. *Id.* at 422 n. 9. Cost of property, in turn, is defined in the Treasury Regulations as the "amount paid for such property in cash or other property." 26 C.F.R. § 1.1012–1(a).

8. The court noted that the loan in question had been made by the bank directly to the corporation, the loan payments were made by the corporation directly to the bank, and neither the corporation nor the shareholders reported the payments as constructive dividends. *Id.*

Under *Leavitt*, the presumption is that the form will control and that presumption will not be surmounted absent the shareholder's satisfying the higher standard applicable to a taxpayer's seeking to disavow the form he selected and recast a transaction. *See* Bowers, *Building Up an S Shareholder's Basis through Loans and Acquisitions*, J. Tax'n S Corp., Fall 1989, at 22, 29.

9. In *Plantation Patterns*, this Court considered whether a Subchapter C corporation could deduct interest payments made on its debt and whether its shareholders had resulting dividend income. The Court, using a debt/equity analysis, affirmed a Tax Court finding that a corporation's interest payments on debentures were constructive dividends and could not be deducted as interest payments. *Id.* at 723–24.

Subsequent decisions have elaborated on *Plantation Patterns* and identified thirteen factors used to establish whether shareholder advances to a corporation are debt or equity. They are:
"(1) the names given to the certificates evidencing the indebtedness;
"(2) the presence or absence of a fixed maturity date;
"(3) the source of payments;
"(4) the right to enforce payment of principal and interest;
"(5) participation in management flowing as a result;
"(6) the status of the contribution in relation to regular corporate creditors;
"(7) the intent of the parties;
"(8) 'thin' or adequate capitalization;
"(9) identity of interest between creditor and stockholder;

debt/equity analysis only after making a finding that an economic outlay had occurred.[10] *Leavitt*, 875 F.2d at 427. The *Leavitt* court reasoned that the legislative history of section 1374 limiting the basis of a Subchapter S shareholder to his corporate investment or outlay could not be circumvented through the use of debt/equity principles.[11] *Id.* at 426 & n. 16. *See generally* Bogdanski, *Shareholder Guarantees, Interest Deductions, and S Corporation Stock Basis: The Problems with Putnam,* 13 J.Corp.Tax'n 264, 268–89 (1986).

Taxpayers press this Court to follow the contrary holding of *Selfe v. United States,* 778 F.2d 769 (11th Cir.1985). There, the Eleventh Circuit ruled that a shareholder's guaranty of a Subchapter S corporation loan could result in an increase in equity or debt basis even though the shareholder had not satisfied any portion of the obligation. *Selfe,* 778 F.2d at 775. The court remanded the case to the district court for it to employ debt/equity principles in determining if the loan in question was in substance one to the shareholder rather than to the corporation. *Id.*

The courts have uniformly ruled that a shareholder must make an economic outlay to increase his Subchapter S corporation stock basis. *See Leavitt,* 875 F.2d at 422; *Selfe,* 778 F.2d at 772; *Brown,* 706 F.2d at 756; *Underwood v. Commissioner,* 535 F.2d 309, 311–12 (5th Cir.1976). Taxpayers assert that if we look beyond the form of the transaction at what they contend is its substance—a loan from Hibernia to them, which in turn they contributed to Harmar as capital—we must find that a $700,000 outlay occurred and that their stock bases

therefore correspondingly increased. They contend that use of debt/equity principles will lead us to such a conclusion.

■ Ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages. *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 97 S.Ct. 850, 856–57, 51 L.Ed.2d 48 (1977); *C.I.R. v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). The IRS, however, often may disregard form and recharacterize a transaction by looking to its substance. *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 357, 84 L.Ed. 406 (1940). The Tax Court has recognized an exception to the rule that a taxpayer may not question a transaction's form in cases such as this one in which the shareholder argues that guaranteed corporate debt should be recast as an equity investment on the shareholder's part. *Blum v. Commissioner,* 59 T.C. 436, 440 (1972).

In this case we find that the transaction as structured did not lack adequate substance or reality and that an economic outlay justifying the basis claimed by Taxpayers never occurred.

■ The summary judgment evidence reflects that the parties to this transaction intended that the Hibernia loan be one to the corporation. Each of the two $350,000 promissory notes was executed by and only in the name of Harmar. The notes have been renewed and remain in the same form, namely notes payable to Hibernia in

---

"(10) source of interest payments;
"(11) the ability of the corporation to obtain loans from outside lending institutions;
"(12) the extent to which the advance was used to acquire capital assets; and
"(13) the failure of the debtor to repay on the due date or to seek a postponement." *In re Lane,* 742 F.2d 1311, 1314–15 (11th Cir.1984) (quoting *Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir.1972)).

**10.** The Fourth Circuit embraced the Tax Court's interpretation of its earlier opinion in *Blum v. Commissioner,* 59 T.C. 436 (1972). In *Blum,* the court rejected the taxpayer's substance over

form argument. The *Leavitt* Tax Court asserted that the *Blum* court never reached the debt/equity issue "because the taxpayer had failed his burden of proving that the bank in substance had loaned the funds to the taxpayer and not to the corporation." *Leavitt,* 90 T.C. at 215. Thus construed, *Blum* in no way undermines the Fourth Circuit's § 1374 analysis.

**11.** *See* S.Rep. No. 1983, 85th Cong., 2d Sess. at 220, U.S.Code Cong. & Admin.News 1958, p. 4791, (1958–3 Cum.Bull. at 1141); *see also* Comment, *Subchapter S Loss Limitation: The Effect of Shareholder Loan Guarantees on Basis,* 40 Sw.L.J. 1241, 1263 (1987).

which the sole maker is Harmar.[12] Hibernia, an independent party, in substance earmarked the loan proceeds for use in purchasing the subject property to which Harmar took title, Harmar contemporaneously giving Hibernia a mortgage to secure Harmar's debt to Hibernia. The bank sent interest due notices to Harmar, and all note payments were made by checks to Hibernia drawn on Harmar's corporate account.[13] Harmar's books and records for all years through the year ended December 31, 1985, prepared by its certified public accountant, reflect the $700,000 loan simply as an indebtedness of Harmar to Hibernia. They do not in any way account for or reflect any of the $700,000 as a capital contribution or loan by Taxpayers to Harmar, although they do reflect the $1,000 capital contribution each Taxpayer made and Harmar's indebtedness to Taxpayers for the various cash advances Taxpayers made to it. The Harmar financial statements for the year ended December 31, 1986, are the first to show any contributed capital attributable to the Hibernia loan. Further, Hibernia's records showed Harmar as the "borrower" in respect to the $700,000 loan and the renewals of it. Harmar's 1982 tax return, which covered August 15 through December 31, 1982, indicates that Harmar deducted $12,506 in interest expenses. Because only the Hibernia loan generated such expenses for that period, it is reasonably inferable that the deduction corresponded to that loan. The 1982 Harmar return showed no distribution to Taxpayers, as it should have if the $700,000 Hibernia loan on which Harmar paid interest was a loan to the Taxpayers. Further, the return shows the only capital contributed as $2,000 and the only loan from stockholders as $68,000, but shows other indebtedness of $675,000. In short, Harmar's 1982 income tax return is flatly inconsistent with Taxpayers' present position. Moreover, there is no indication that Taxpayers treated the loan as a personal one on their individual returns by reporting Harmar's interest payments to Hibernia as constructive dividend income. In sum, the parties' treatment of the transaction, from the time it was entered into and for years thereafter, has been wholly consistent with its unambiguous documentation and inconsistent with the way in which Taxpayers now seek to recast it. Hibernia was clearly an independent third party, and the real and bona fide, separate existence of Harmar is not challenged. The parties did what they intended to do, and the transaction as structured did not lack adequate reality or substance.[14]

12. In his deposition, when discussing the documentation required to make the loan, Smith stated that items such as the corporate certificate of good standing, corporate charter, and articles of incorporation were prerequisites to closing the loan because Hibernia needed to know that it was "dealing with a valid entity." Harris' deposition demonstrates that he intended the loan to be one to Harmar. He acknowledged there that his legal and tax consultants had advised him that it was to his advantage to have a corporation borrow the funds from Hibernia. Martin stated that he was aware that in signing the promissory notes on November 1, 1982, he was executing them on behalf of Harmar.

13. To the extent Harmar did not have funds available, Taxpayers would deposit personal funds into Harmar's account, but the checks were always drawn on Harmar's checking account. These and other amounts advanced by Taxpayers to Harmar were carried on its books as part of its interest-bearing indebtedness *to Taxpayers.*

14. This is unlike the situation in *Underwood,* 535 F.2d at 312 & n. 2, where we allowed the IRS to disregard a note of the shareholders of the Subchapter S corporation to another of their wholly-owned corporations that was substituted for the Subchapter S corporation's note, because it was not shown that the shareholders there intended to or would ever "make a demand upon themselves ... for payment of their note." Here, Hibernia was clearly an independent third party (and it is those who structured the transaction, not the IRS, who seek to recast it).

We also observe that this case stands in contrast to those involving nominees or dummy corporations. In such instances, courts may look beyond the form of a transaction if it is clear that the corporation served no significant business activity and that the shareholders intended that the corporation serve only as a dummy for them. *See, e.g., Paymer v. Commissioner,* 150 F.2d 334, 337 (2d Cir.1945); B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 2.10 (1979). In this case, Taxpayers intended that Harmar conduct significant business activity, and they do not contend that Harmar's separate, corporate identity should be disregarded or that it was a mere sham.

Moreover, if the transaction is to be "recast," it is by no means clear that it should be recast in the form sought by Taxpayers, namely as a cash loan to them from Hibernia followed by their payment of the cash to Harmar as a contribution to its capital, and Harmar's then using the cash to purchase the building. Such recasting does not account for Hibernia's mortgage on the building. In any event, if the transaction is to be recast, why should it not be recast as a loan by Hibernia to Taxpayers, with the Taxpayers using the funds to themselves purchase the building, giving Hibernia a mortgage on the building to secure their debt to it, and then transferring the building, subject to the mortgage, to Harmar as a contribution to capital? Presumably in that situation Taxpayers' bases in their Harmar stock would be reduced by the amount of the debt secured by the mortgage under I.R.C. § 358(d). *See Wiebusch v. Commissioner*, 59 T.C. 777, *aff'd* per curiam "on the basis of the opinion of the Tax Court," *Wiebusch v. Commissioner*, 487 F.2d 515 (8th Cir.1973).[15] While section 358(d) likely does not affect stockholder basis in the debt of the Subchapter S corporation to the stockholder, Taxpayers have not sought to recast the transaction as a loan by Hibernia to them followed by their loan of the proceeds to Harmar; indeed even after Harmar's books were rearranged starting with the year ending December 31, 1986, the books do not show any indebtedness in this respect of Harmar to Taxpayers and do continue to show Harmar as owing the money in question to Hibernia. There is simply no evidence of Harmar indebtedness to Taxpayers in respect to these funds.

Taxpayers' guarantees and Harris' pledge of certificates of deposit do not undermine the intent of the parties that Harmar be the borrower in this transaction. It certainly is not difficult to fathom that a careful lender to a new, small, closely held corporation such as Harmar would seek personal guarantees from all of its shareholders. *See* Bogdanski, *supra*, at 269. Moreover, the wholly unperformed guarantees do not satisfy the requirement that an economic outlay be made before a corresponding increase in basis can occur. *See generally Underwood*, 535 F.2d at 312. In the same light, Harris' pledge to Hibernia of some $355,000 in certificates of deposit of his (and Harris Mortgage Corporation) does not provide such an outlay.[16]

We conclude that the transaction must be treated as it purports to be and as the parties treated it—namely as a loan by Hibernia to Harmar, all payments on which through the relevant time have been made by Harmar to Hibernia. For any funds or other assets Taxpayers have actually provided to Harmar as loans or contributions, Taxpayers are, of course, entitled to basis additions as of the time such contributions or loans were furnished by them to Harmar, but they are not entitled to a 1982 basis addition for Hibernia's 1982 $700,000 loan to Harmar, notwithstanding that it was also secured by Taxpayers' execution of guarantees and Harris' pledge to Hibernia of his and Harris Mortgage Corporation's certificates of deposit in the total face amount of some $355,000.

## Conclusion

There was no genuine dispute as to any material fact necessary to sustain the

We do not suggest that had the transaction been structured in a different manner it would have lacked adequate substance or reality, or that there was no way the transaction could have been structured to afford Taxpayers a further $700,000 basis in Harmar under section 1374(c)(2) (now section 1366(d)(1)).

15. *See also* Megaard, *No Stock Basis for Shareholder Guarantee of S Corporation Debt*, 15 J.Corp. Tax'n 340 (1989). Megaard explains that "[u]nder Section 358(d), the assumption by a corporation of its shareholder's debt is treated as money received which reduces the shareholder's basis in the stock." *Id.* at 349. *Cf. id.* at 350

("Having the corporation's assets encumbered by the shareholder's personal debt runs the risk of a basis reduction under Section 358 should the Service argue that the transaction was a purchase by the shareholder of the ... assets followed by a contribution of the assets to the corporation subject to the debt.").

16. Taxpayers would have us, in effect, convert this pledge to Hibernia into a $700,000 cash contribution made to Harmar by Taxpayers equally. But that did not happen. Taxpayers do not contend that the certificates of deposit were contributed to Harmar's capital.

Government's summary judgment motion. The district court's judgment is correct and it is therefore

AFFIRMED.