T.C. Memo. 2002-108

UNITED STATES TAX COURT

JERRY L. THOMAS AND FREDA THOMAS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18729-99.                    Filed April 30, 2002.

<u>David D. Aughtry</u> and <u>David R. Mackusik</u>, for petitioners.

<u>William L. Blagg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Respondent determined deficiencies in petitioners' 1991, 1993, 1994, and 1995 Federal income taxes and

accuracy-related penalties under section 6662(a).[1]  The amounts

of these determinations are as follows:

| | | Accuracy-related penalty |
|---|---|---|
| Year | Deficiency | sec.6662(a) |
| 1991 | $125,996 | – 0 – |
| 1993 | 69,018 | $13,804 |
| 1994 | 581,181 | 116,236 |
| 1995 | 2,247 | 449 |

Following concessions, we must decide:

1.  Whether certain transactions increased the basis of

Jerry L. Thomas (Jerry) in two S corporations named Ram

Extrusions, Inc. (Ram), and Innovative Fibers, Inc. (Innovative),

and one limited liability company named Twist-Tex, LLC (Twist-

Tex).

2.  Whether certain payments made to Jerry in connection

with his sale of his interest in Conquest Carpet Mills, Inc.

(Conquest), are taxable as capital gains or ordinary income.

3.  Whether petitioners are liable for the accuracy-related

penalties respondent determined for 1993 and 1994.

FINDINGS OF FACT

Some facts were stipulated.  We incorporate herein by this

reference the parties' stipulation of facts and the exhibits

submitted therewith.  We find the stipulated facts accordingly.

Petitioners are married individuals who filed joint Federal

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

income tax returns for the subject years.  Jerry and his wife,
Freda, resided in Georgia and South Carolina, respectively, when
their petition was filed.

Bases in Ram, Innovative, and Twist-Tex

Jerry works in the carpet industry and owns or has owned
interests in various companies.  These companies include:
(1) Ram, Innovative, and three other S corporations named
American Extrusions (American), Thomas Service Industries, Inc.
(TSI), and Mattel Carpet & Rug, Inc. (Mattel), (2) Twist-Tex and
one other limited liability company named U.S. Extrusions, and
(3) one C corporation named Inter-Con Trading Group, Inc. (Inter-
Con).  Jerry's ownership interests in these eight entities were
as follows:

| | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|
| American | 35% | 35% | 35% | 35% |
| Innovative | -0- | 25 | 25 | 25 |
| Inter-Con Trading Group, Inc. | 100 | 100 | 100 | 100 |
| Mattel[1] | 50 | 50 | 50 | 50 |
| Ram | -0- | 25 | 25 | 25 |
| TSI | 100 | 100 | 100 | 100 |
| Twist-Tex | -0- | 33.3 | 33.3 | 33.3 |
| U.S. Extrusions | -0- | -0- | 33.3 | 33.3 |

[1] Mattel's only other shareholder during these
years was Jerry's brother Mike.

Petitioners contend that Jerry had sufficient bases in
certain of the passthrough entities to allow him to carry back
losses incurred in subsequent years.  For 1995, Jerry's
distributive share of Ram's ordinary loss was $1,231,845, and his

basis in Ram was at least $1,150,000. That minimum basis does not reflect certain disputed items (1995 disputed items) related to Ram's receipt of two checks in late 1995. First, on November 16, 1995, Inter-Con wrote a $60,000 check to Ram, Inter-Con wrote a $65,000 check to Twist-Tex, and TSI wrote a $125,000 check to Inter-Con to cover the two checks that it wrote (November Inter-Con payment). TSI's 1995 books and records (collectively, records) treated the $125,000 check to Inter-Con as a loan receivable from Ram and Twist-Tex. Ram's 1995 and 1996 records treated the $60,000 check as a note payable to Inter-Con. Inter-Con's 1995 records treated the $60,000 and $65,000 checks as notes receivable from Ram and Twist-Tex, respectively, and treated the $125,000 check as a note payable to TSI. Second, on December 5, 1995, Jerry's brother Perry (Perry) wrote Ram a $100,000 check, and TSI wrote Perry a $100,000 check to cover the clearance of Perry's check (December 1995 payment). TSI's 1995 records treated its $100,000 check as a loan receivable from Perry/Ram. Ram's 1995 records initially treated its receipt of Perry's $100,000 check as a loan from Jerry to Ram. That treatment was changed as of the end of that year to show the check as a loan from Perry to Ram. Ram's 1996 records treated its receipt of Perry's $100,000 check as a note payable to Perry.

During 1996, respondent commenced his examination of petitioners for the subject years and requested substantiation of

Jerry's bases in various S corporations. During 1997, the 1995 advances from Perry and Inter-Con were reclassified on Ram's books (by Ram) first as a note payable to Jerry and then as additional paid-in capital of Jerry.

For 1996, Jerry's distributive share of Ram's ordinary loss was $805,269, and his basis in Ram was at least $260,000. That minimum basis does not reflect certain other disputed items (1996 disputed items) set forth below:

| Date | Description | Amount |
|------|-------------|--------|
| 1/3/96 | TSI check to Inter-Con and Inter-Con check to Ram | $28,000 |
| 1/10/96 | TSI check to Inter-Con and Inter-Con check to Ram | 75,000 |
| 3/20/96 | Mattel check to Jerry, deposited in Inter-Con account and Inter-Con check to Ram | 200,000 |
| 4/4/96 | TSI check to Ram | 100,000 |
| 5/17/96 | Emerald Carpets[1] check to American, endorsed by Ram and deposited in Ram's bank account | 300,000 |
| 7/10/96 | Mattel check to Inter-Con and Inter-Con check to Ram | 200,000 |
| 12/18/96 | Mattel check to Regions Bank and Regions Bank check to Ram | 100,000 |

[1] The check to American from Emerald, a third party corporation unrelated to Jerry, was evidenced by a promissory note from American to Emerald.

Ram's 1996 records reported the $503,000 of these checks written by Inter-Con to Ram as a note payable to Inter-Con. That treatment was reclassified by Ram in 1997 to report the checks first as a note payable to Jerry and then as additional paid-in

capital of Jerry. The $200,000 in checks written by Mattel were treated on Mattel's 1996 records as notes payable to TSI. Mattel changed that treatment in 1997 to report the checks as notes payable to Jerry.

The balance sheets of TSI for 1995 and 1996 and the balance sheets of Inter-Con for 1995, 1996, and 1997 showed no loans to shareholders. Mattel's balance sheets for the periods ended September 30, 1996 and 1997, also showed no loans to shareholders.

Payments Related To Conquest Sale

In 1981, Jerry and Paul Walker (Walker) incorporated Conquest, and they equally owned all of Conquest's stock until they sold the stock in 1988. On or about June 10, 1988, Walker, Jerry, Penta Enterprises, Inc. (Penta), Beaulieu of America, Inc., and D&W Carpet & Rug Co., Inc., entered into a stock acquisition agreement (stock acquisition agreement) providing, inter alia, that (1) Walker and Jerry shall sell to Penta 100 percent of the issued and outstanding capital stock in Conquest; (2) the closing of the sale shall take place on or about June 28, 1998; (3) the parties shall enter into "Non-Compete Agreements," "Employment Agreements," "Promissory Notes," and "Guaranty Agreements" substantially in the form attached to the Stock Acquisition Agreement.

The relevant provisions of the stock acquisition agreement provided:

9.  PURCHASE PRICE.

    Subject to the adjustments set forth in Section 12 hereof, the "purchase price" of the Stock shall be Eight Million ($8,000,000.00) Dollars in the aggregate, which shall be paid as follows:

    (a)  $3,000,000.00 to each Seller in cash or immediately available funds; and

    (b)  $1,000,000.00 to each Seller in 10-year promissory notes (collectively referred to hereinafter as the "Notes") substantially in the form of Exhibit "R" hereto and bearing interest in the case of Thomas, at 8-1/4% per annum, and in the case of Walker at 7-7/8% per annum.

    *     *     *     *     *     *     *

10C.  CONDITIONS TO CLOSING BY EACH PARTY HERETO.

    The obligations of each party hereto to consummate the transactions contemplated hereby shall be subject to the satisfaction (or waiver by such party) on or prior to the Closing of the following conditions precedent:

    *     *     *     *     *     *     *

    (c)  The Company shall have entered into agreements substantially in the form of Exhibit "W" attached hereto, with Walker and Thomas, pursuant to which, in consideration of their agreement to refrain (in the case of Walker for 10 years and in the case of Thomas for 6 years) from competing with the Company directly or indirectly in the sale or manufacture of carpet and carpet products (including outdoor carpet), (A) Walker shall be paid $8,500,000 in 37 quarterly installments of $229,730, commencing on the

first anniversary of the Closing, and (B) Thomas shall be paid $7,500,000 in 21 quarterly installments of $357,143, commencing on the first anniversary of the Closing.  (Such agreements are sometimes collectively referred to herein as the "Noncompete Agreements").

*    *    *    *    *    *    *

12.  PURCHASE PRICE ADJUSTMENTS.

(a)  The parties acknowledge that the purchase price is based upon Sellers' representation that the Company's net worth (as defined below) at June 4, 1988 will be $8,000,000.00.  A certified audit of the Company will be conducted as of June 4, 1988 by Peat Marwick, Main & Company (or such independent public accountants as are satisfactory to Buyer and Sellers) (said audit being sometimes referred to herein as the "June 4, 1988 Audit").  If said audit determines that the net worth of the company is less than or greater than as so represented by Sellers, then the purchase price shall be adjusted in accordance with the following formula:

(i)  The portion of the purchase price payable to each Seller shall be reduced one dollar ($1.00) for each dollar that net worth of the Company as at June 4, 1988 is below $8,000,000.00.

(ii)  The portion of the purchase price payable to each Seller shall be increased one-half dollar ($.50) for each dollar that net worth of the Company as at June 4, 1988 is above $8,000,000.00.

For the purpose of this Section and June 4, 1988 Audit, "net worth" shall be the stockholders' equity determined as of such date on the accrual basis in accordance with generally accepted accounting principles consistently applied less (i) the amount

payable to the Sellers pursuant to Subsection (b) of this Section 12 below, (ii) all receivables from Dynasty Carpet, to the extent not already written off, and (iii) the amount of all distributions made during the current fiscal year which are chargeable to stockholders' equity and which have not already been so charged.

        \*     \*     \*     \*     \*     \*     \*

15. <u>Miscellaneous</u>.

\* \* \*  This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and there are no representations, warranties, agreements, undertakings, or conditions, express or implied, except as set forth herein.  This Agreement may not be amended, supplemented or otherwise modified, except by an instrument in writing, signed by each of the parties hereto.  Whenever used herein, (i) the terms "this Agreement", "herein", "hereunder", "hereby", and words of similar import shall be deemed to mean this instrument together with all attachments hereto.  \* \* \*

The relevant portions of Jerry's noncompete agreement

provided:

3.  <u>Seller's Covenants</u>.

\* \* \*  Seller hereby covenants and agrees that he will not, directly or indirectly, during the period commencing on the date hereof and ending six years hereafter: (i) disclose \* \* \* Confidential Information known to him; (ii) own, manage, operate, join control, assist, participate in or be connected with, directly or indirectly (and including as an officer, director, shareholder, partner, proprietor, consultant, independent contractor or lender), any person who is directly or indirectly in competition within the Territory [anyplace the Company is doing business on the date of the agreement] with the Business of the Company [manufacture and sale of carpets (including outdoor carpet), rugs or yarn or any activities ancillary thereto, but not including the manufacture and sales of chemicals, plastic wrap or cores]

4.    Payments for Non-Competition.

In consideration of the Seller's covenants set forth in paragraph 3 hereof, the Company [Conquest] promises to pay the Seller [Jerry] the aggregate sum of $7,500,000.00 payable (in each case with a five day grace period) in 21 quarterly installments of $357,143.00 commencing on the first anniversary of the date hereof.

*    *    *    *    *    *    *

7.    The parties hereto acknowledge that Mattel Carpet & Rugs, Inc. ("Mattel") and the Company [Conquest] have been engaged in the manufacture and sale of certain similar products in the same market, and that they purchase products from one another and may be in competition with one another in certain market segments, and the parties acknowledge that Mattel and the Company will continue to purchase, manufacture and sell such products.  Anything to the contrary herein notwithstanding, Seller shall be permitted to own an interest in and be involved in the management of (i) Thomas Services Industries, Inc., provided that such corporation does not compete with the Business of the Company, (ii) Hawk Extrusions, Inc., provided that such corporation does not compete with the Business of the Company other than engaging in the extrusion of bulk continuous filament (BCF) yarn, and (iii) Mattel provided that (a) Mattel does not own or operate any extrusion units, finishing range ovens, carpet backing ovens, twist, ply and heat set equipment, dying equipment or tufting equipment, (b) Mattel does not enter any new market segments in competition with the Business of the Company, and (c) if Mattel introduces new products into markets that Mattel is currently in, Mattel will purchase such new products from the Company, D&W Carpet & Rug Co., Inc. ("D&W") or Beaulieu of American, Inc. ("Beaulieu") at the following prices: (1) level loop products – cost plus 8% and (2) grass (indoor/outdoor) – cost plus 10%; provided, however, that in the event that (A) neither the Company, Beaulieu nor D&W elects to manufacture and sell such new products to Mattel, or (B) the prices offered by the Company, D&W and Beaulieu are not competitive and Mattel can either purchase or manufacture such new products below the prices offered by the Company, D&W or Mattel, then, in either such event, Mattel may

purchase from other sources or manufacture and sell such products without Seller being deemed to have breached this Agreement. The ownership of an interest in or the involvement in the management of Mattel at a time when Mattel owns or operates any extrusion units, finishing range ovens, carpet backing ovens, twist, ply or heat set equipment, dying equipment or tufting equipment shall be deemed to constitute an intentional breach hereof by Seller for purposes of Section 4 hereof. The ownership of an interest in or the involvement in the management of Mattel at a time when Mattel engages in the manufacture or sale of one or more new products (except as permitted by clause (c) above) or enters into one or more new markets in competition with the Business of the Company shall be deemed to constitute an unintentional breach hereof by Seller.

When the stock acquisition and noncompete agreements were signed, Mattel was equally owned by Jerry and his brother Ronald (Ronald). In the fall of 1989, M.E. Ralston (Ralston), an officer and a 50-percent owner of Conquest, purchased Ronald's interest in Mattel.[2] A clause in the purchase agreement provided:

I [Ralston] will cause Jerry Thomas's noncompete agreement with Conquest Carpet Mills, Inc. to be modified in such a manner that neither his participation in Specialty [Mattel] nor the loaning of money by him to Specialty [Mattel], Turftcraft, or you [Ronald] will be in violation of such agreement.

After Ralston purchased an interest in Mattel, Conquest did not enforce the provisions of Jerry's noncompete agreement as to

---

[2] After Ralston's purchase, the company changed its name to Specialty Carpets, Inc. The right to use the Mattel name was retained by Ronald, who continued to sell carpet in the hospitality market. For clarity, we refer to the company as Mattel throughout this opinion.

his involvement with Mattel. Ralston gave permission to Jerry for Mattel to compete with Conquest without restriction and to do whatever was necessary to make Mattel profitable. From 1990 onward, Mattel introduced new products and entered new markets without complying with the terms of Jerry's noncompete agreement.

Jerry received the following payments attributable to his noncompete agreement:

| Year | Amount |
| --- | --- |
| 1989 | $589,031 |
| 1990 | 987,263 |
| 1991 | 1,068,711 |
| 1992 | 1,785,715 |
| 1993 | 1,071,429 |
| 1994 | 1,071,926 |

Other Facts

Jerry was an active trader of securities. During 1992, he made 322 security trades through licensed brokers. In 1993, he made through brokers approximately 226 sales and 285 purchases of securities having total values of $15,255,341 and $16,465,415, respectively. In 1994, he made through brokers approximately 294 sales and 420 purchases of securities having total values of $19,822,148 and $22,688,408, respectively. Petitioners reported these activities on their Federal income tax returns as resulting in capital gains in 1992 and resulting in ordinary losses in 1993, 1994, and 1995. Respondent determined, and petitioners have since conceded, that the losses in 1993, 1994, and 1995 were reportable as capital losses.

OPINION

I.  Basis

Petitioners claim an entitlement to carry back and deduct
for 1994 their proportionate share of Ram's losses from 1995 and
1996.  A shareholder of an S corporation may take into account
his or her pro rata share of the S corporation's loss.  Sec.
1366(a)(1).  A shareholder's deduction of that loss, however, is
limited to the amount that equals his or her adjusted basis in:
(1) The S corporation's stock and (2) any indebtedness of the S
corporation to the shareholder (collectively, S corporation
investment).  Sec. 1366(d)(1).  Any loss so limited and thereby
disallowed in a particular taxable year may be carried forward
indefinitely.  Sec. 1366(d)(2).  To deduct their pro rata share
of Ram's losses, petitioners must prove that they had sufficient
adjusted basis in their S corporation investment in Ram.[3]

The parties disagree on whether the disputed transactions
increased Jerry's adjusted basis in Ram.  Each of those
transactions involved funds provided to Ram directly from someone
other than Jerry.  Petitioners contend that Jerry indirectly

---

[3] Sec. 7491(a), which places the burden of proof upon the
Commissioner in specified circumstances, is inapplicable to this
case.  Sec. 7491(a) applies only to court proceedings arising
from examinations commencing after July 22, 1998.  Internal
Revenue Service Restructuring and Reform Act of 1998, Pub. L.
105-206, sec. 3001(c), 112 Stat. 727.

provided those funds and that the disputed transactions increased their basis in Ram.

The decided cases have established certain principles concerning when a shareholder may claim increased basis in an S corporation investment. First, there must be an actual economic outlay by the taxpayer who claims the basis increase. Underwood v. Commissioner, 535 F.2d 309 (5th Cir. 1976) (rearrangement by way of exchange of notes in respect of loan of funds by a C corporation to an S corporation insufficient), affg. 63 T.C. 468 (1975); Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988) (existence of a contingent liability of a shareholder as guarantor insufficient), affd. 875 F.2d 420 (4th Cir. 1989); Perry v. Commissioner, 54 T.C. 1293, 1296 (1970) (exchange of notes between shareholder and S corporation insufficient), affd. 27 AFTR 2d 71-1464, 71-2 USTC par. 9502 (8th Cir. 1971). Second, the indebtedness of the S corporation must run directly to the shareholder claiming an increase in basis; an indebtedness of an S corporation to an entity with passthrough characteristics which advanced the funds and is closely related to the taxpayer does not satisfy this requirement. See, e.g., Frankel v. Commissioner, 61 T.C. 343 (1973) (partnership), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974); Prashker v. Commissioner, 59 T.C. 172 (1972) (estate); Burnstein v. Commissioner, T.C. Memo. 1984-74 (S corporation).

To prevail in this case, petitioners must prove that Jerry, as opposed to one of his entities, invested in Ram. E.g., Prashker v. Commissioner, supra at 176 (where the estate of which the taxpayer was executrix and the sole beneficiary advanced funds to an S corporation of which she was a 50-percent shareholder, the Court noted that "the key question is whether or not the debt of the corporation runs 'directly to the shareholder'"). In other words, petitioners must prove that they made the economic outlay and that the disputed transactions created indebtedness on the part of Ram that ran directly to Jerry. Id. ("a shareholder could borrow the money personally and then loan the money to the corporation. In that event the corporation's debt would run directly to the shareholder"); accord Hitchins v. Commissioner, 103 T.C. 711, 715 (1994) (where the Court stated that an indebtedness to an entity with pass-through characteristics that had advanced the funds to the S corporation and was closely related to the taxpayer generally did not satisfy the statutory requirements necessary to increase a shareholder's basis).

In a limited number of situations, the fact that the borrowed funds originate with a closely related entity will not preclude a finding that the indebtedness of the S corporation runs directly to the shareholder and amounts to an economic outlay by the shareholder. See Culnen v. Commissioner, T.C.

Memo. 2000-139; see also Yates v. Commissioner, T.C. Memo. 2001-280. In cases where a shareholder claims basis in an S corporation for funds advanced initially by a related entity, the Court will closely scrutinize the facts surrounding the transfer of funds to determine whether they establish a relationship that allows the shareholder to satisfy the requirements for an increase in basis. "Ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages." Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990); see also Estate of Leavitt v. Commissioner, 875 F.2d at 423 ("taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made").

In a case where a C corporation acted as the agent of a shareholder in disbursing funds to an S corporation, and the S corporation acknowledged a direct debt to the shareholder and not to the C corporation, the Court held that the shareholder's basis in the S corporation was increased. Culnen v. Commissioner, supra. The Court found that the shareholder's loan account in his wholly owned C corporation was debited when he requested funds be disbursed to the S corporation to allow the shareholder

to invest in the S corporation.  The Court found that the S corporation recorded the funds received as a loan from the shareholder and that the disbursing C corporation reported the funds disbursed as a loan to the shareholder.

Here, each of the disputed transactions involved a third party providing funds to Ram.  In order to determine whether any of these transactions increased Jerry's basis in Ram, we examine each transaction individually.

<u>1995 Disputed Items</u>

<u>The November Inter-Con Payment</u>

Inter-Con is a C corporation that is wholly owned by Jerry. The record does not disclose credible evidence that supports a finding that the $60,000 Ram received was a loan from Jerry.  In fact, Inter-Con's 1995 trial balance records a $60,000 receivable from Ram and shows no evidence of any loans to shareholders.[4]

Petitioners rely, in part, on a $60,000 promissory note purportedly executed by Ram in favor of Jerry on November 11, 1995, to support a proposed finding that the November Inter-Con payment created a direct indebtedness to Jerry.  We give no weight to this note.  It predates the November 16, 1995,

---

[4] The general ledgers of TSI and Inter-Con for the relevant years were not introduced into evidence.  Petitioners' failure to introduce these records into evidence leads us to conclude that the records would have treated the disputed transactions as intercompany loans rather than as loans from Jerry.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

transaction. Moreover, we find incredible petitioners'
explanation for why Inter-Con, rather than Jerry, provided the
funds to Ram. According to petitioners, it was more convenient
to use the Inter-Con account rather than Jerry's personal account
that was kept approximately 30 miles from Ram's offices. We
consider this explanation to be an unsupported, after-the-fact
rationalization in support of petitioners' position as to the
loans. We conclude that Jerry may not increase his basis in Ram
on account of the $60,000 November Inter-Con payment.[5]

December 1995 Payment

Perry wrote a $100,000 check to Ram on December 5, 1995, and
TSI reimbursed Perry on the same day. Perry testified that he
advanced these funds on his brother's behalf, that he did not
have sufficient personal funds to cover his check without being
reimbursed by Jerry, and that he considered the funds he received
from TSI as coming from Jerry. The parties also stipulated a
$100,000 promissory note dated December 5, 1995, executed by Ram
in favor of Jerry. We find this evidence, in light of the
credible evidence in the record, to be inadequate to meet
petitioners' burden as to this transaction. On the basis of the
record as a whole, we simply cannot conclude that this $100,000
payment constituted an economic outlay by Jerry or that it

---

[5] For similar reasons, we also conclude that Jerry may not
increase his basis in Twist-Tex on account of the $65,000
November Inter-Con payment.

created a direct indebtedness of Ram to Jerry.  We conclude that Jerry's basis in Ram for 1995 may not be increased by this amount.

## 1996 Disputed Items

### 1/3/96 and 1/10/96 Payments

We do not find any credible evidence in the record that Inter-Con was an agent for Jerry when it transferred the relevant funds.  We conclude that Jerry is not entitled to increase his basis in Ram on account of either of these payments.

### 3/20/96 Payment

On March 20, 1996, Mattel wrote a $200,000 check to Jerry, and Jerry deposited the check in Inter-Con's account.  One day later, Inter-Con wrote a $200,000 check to Ram.  We have received no credible explanation of why funds payable to Jerry were deposited in Inter-Con's account.

Petitioners selected the form of the funds flow and are bound by the form they selected.  Harris v. United States, supra at 443.  Moreover, they offered no credible explanation why we should not respect the form of this transaction.  That form supports the conclusion of an investment in or loan to Inter-Con by Jerry and a loan by Inter-Con to Ram.
In these circumstances, petitioners failed to meet their burden of proving that Inter-Con advanced funds to Ram as Jerry's agent, that direct indebtedness resulted from Ram to Jerry, or that

Jerry made the required economic outlay. Jerry is not entitled to increase his basis in Ram by this payment.

### 4/4/96 Payment

Petitioners claim to be entitled to increase their basis in Ram by $100,000 because of this payment. Petitioners argue that TSI acted as Jerry's agent in advancing the $100,000 to Ram. Petitioners point to the date of this $100,000 check and to a non-interest-bearing note from Ram to Jerry of the same date and in the same face amount. On the basis of the record as a whole, we are unpersuaded that this payment constituted an economic outlay by Jerry or that it created a direct indebtedness of Ram to Jerry. Jerry's basis in Ram for 1996 may not be increased by this amount.

### 05/17/96 Payment

On May 17, 1996, American borrowed $300,000 from Emerald Carpets, Inc. The obligation is secured by guaranties by Walker and Jerry and is evidenced by an interest-bearing promissory note of the same date. Emerald Carpet, Inc., provided these funds by writing a $300,000 check to American which was deposited into Ram's bank account.

Petitioners claim that this transaction entitles them to basis of $120,000 in Ram and basis of $30,000 in Innovative. Petitioners point to a $120,000 non-interest-bearing promissory note from Ram to Jerry dated June 1, 1996, and a $30,000 non-

interest-bearing promissory note from Innovative to Jerry dated May 22, 1996, as evidence of Ram's and Innovative's direct indebtedness to Jerry.

The form of this transaction supports a conclusion that there was an investment or loan by American in or to Ram. As a mere guarantor of the American debt, Jerry may neither increase his basis in American, Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), nor increase his basis in Ram by virtue of American's investment and his partial ownership of American, Frankel v. Commissioner, 61 T.C. 343 (1973), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974). In these circumstances, petitioners failed to meet their burden of proving that American advanced funds to Ram as Jerry's agent, that direct indebtedness from Ram to Jerry resulted from American's endorsing the Emerald check to Ram, or that Jerry made the required economic outlay. Jerry may not increase his basis in Ram by the $120,000 advanced to Ram (a portion of the $300,000 advanced). Nor may he increase his basis in Innovative by $30,000 as a result of this transaction.

### 7/10/96 Payment

Petitioners assert that the Mattel check issued to Inter-Con was to repay part of Mattel's indebtedness to Jerry. The parties have stipulated that initially the transaction was reflected on Mattel's books as a $200,000 reduction to a note payable to TSI.

Mattel's 1997 books were later changed to reflect that the note was payable to Jerry rather than TSI, and the amendment was made by marking through "TSI" and writing "Jerry Thomas" thereafter. Ram executed a $200,000 promissory note dated July 10, 1996, to Jerry. On Ram's 1996 balance sheet, which was prepared after respondent commenced his audit, this transaction is shown as part of $1,968,000 due to Jerry.

The form of the transaction supports a conclusion that there was an investment or loan by Inter-Con in or to Ram. In these circumstances, petitioners failed to meet their burden of proving that Inter-Con advanced funds to Ram as Jerry's agent, that direct indebtedness resulted from Ram to Jerry, or that Jerry made the required economic outlay. Jerry may not increase his basis in Ram by the $200,000 advanced by Inter-Con to Ram.

12/18/96 Payment

On December 18, 1996, Mattel wrote a $100,000 check to Regions Bank, and Regions Bank issued a $100,000 cashier's check which was negotiated by Ram. As with the Inter-Con-Ram 7/10/96 payment, there is insufficient evidence to convince the Court of Jerry's direct investment in Ram.

For the same reasons set out in relation to the 7/10/96 payment, petitioners failed to meet their burden of proving that Mattel advanced funds to Ram as their agent, that direct indebtedness resulted from Ram to Jerry, or that Jerry made the

required economic outlay. Jerry may not increase his basis in Ram by the $100,000 advanced by Mattel to Ram.

### Innovative Payment

On February 2, 1996, TSI wrote a $3,000 check to Innovative. Petitioners assert that TSI acted as Jerry's agent and was merely used as Jerry's incorporated pocketbook. The credible evidence in the record does not support this assertion. We conclude that Jerry may not increase his basis in Innovative by $3,000 on the basis of this transaction.

## II. Characterization Of Noncompete Payments

Petitioners' 1989, 1990, 1991, and 1992 Federal income tax returns characterized the noncompete payments as ordinary income. Petitioners seek to characterize the continuation of those payments in 1993 and 1994 as capital gains. Petitioners argue primarily that they should be relieved of the tax consequences flowing from the apportionment of the purchase price in the 1988 stock acquisition agreement. Petitioners assert alternatively that events in 1989 establish that a new agreement was reached under which the noncompete payments petitioners received in 1993 and 1994 are treated as capital gains rather than ordinary income.

### Primary Argument

Given petitioners' different residences, this case is appealable to the Courts of Appeals for the Fourth and Eleventh

Circuits. Because the decisional law of those circuits, as we understand it, may differ as to when an individual may avoid the tax consequences of his or her apportionment of a purchase price in a written contract, we analyze the law of both circuits. We conclude that the result is the same under the law in both circuits. We also reach the same result under our caselaw. E.g., Gen. Ins. Agency, Inc. v. Commissioner, T.C. Memo. 1967-143, affd. 401 F.2d 324 (4th Cir. 1968).

The Court of Appeals for the Eleventh Circuit has adopted the rule of Danielson v. Commissioner, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). Plante v. Commissioner, 168 F.3d 1279 (11th Cir. 1999), affg. T.C. Memo. 1997-386; Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984). Respondent argues here, as he did in Danielson, that where the parties to the sale of a business have entered into a written agreement setting out the amount to be paid for a covenant not to compete, they may not for tax purposes attack that agreement absent fraud, duress, or undue influence.

Petitioners have adduced extrinsic evidence to attempt to establish an ambiguity in the apportionment of the Conquest purchase price. We find that evidence unpersuasive. The relevant terms of the stock acquisition and noncompete agreements are clear and unambiguous on their face. Petitioners have not adduced any evidence that would establish that either of

those agreements is unenforceable due to mistake, undue influence, fraud, duress, or other similar ground. In fact, petitioners have stipulated that both agreements are enforceable contracts. In these circumstances, petitioners are bound by the tax consequences flowing from the apportionment of the purchase price in the agreements.

The Court of Appeals for the Fourth Circuit has not adopted the rule in Danielson.[6] Gen. Ins. Agency, Inc. v. Commissioner, 401 F.2d 324 (4th Cir. 1968). In Gen. Ins. Agency, the Court of Appeals analyzed a transaction involving a sale of an insurance agency and a covenant not to compete. Id. at 327. The court held that

> the determination of whether a part of the purchase price represents payment for a noncapital item, i.e., a covenant not to compete, depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement. It is necessary also to establish that the covenant "have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." [Id. at 330; fn. refs. omitted (quoting Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961)).]

A determination of the intent of the parties to an agreement and the economic substance of a transaction is a question of

---

[6] We have also declined to adopt that rule, e.g., Coleman v. Commissioner, 87 T.C. 178, 202 n.17 (1986), and apply it only when a case is appealable to a court that has adopted the rule, Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 439-440 (1994).

fact. Id. at 329.  As mentioned above, none of the evidence adduced by petitioners, including the original offer letters from the purchasers, persuades us either that the apportionment of the purchase price is ambiguous or that the intent of the parties to the stock acquisition and noncompete agreements is other than that reflected by the terms of the agreements.

Petitioners rely on a number of facts to argue that the apportionment lacks economic substance and therefore should not be respected.  Specifically, petitioners observe that the noncompete payments inured to the benefit of Jerry's heirs and successors, that postclosing adjustments were made to the noncompete payments, that the aggregate (unadjusted) amount paid for the noncompete agreements is twice the amount paid for the underlying business assets, and, purportedly, that the noncompete payments bore interest.

None of these arguments taken individually or together convince us that the apportionment lacked economic substance. The fact that the benefits of the noncompete agreement enure to the benefit of Jerry's heirs and successors is unremarkable given that the noncompete agreement provided that a set sum would be paid for Jerry's noncompetition.  That sum was to be paid over time, and the purchaser could discontinue further payments, if Jerry breached the agreement.

Petitioners also allege that the noncompete payments bore interest. We find no basis for this allegation. It is true that the second offer letter makes reference, in a handwritten modification, to the payments' bearing interest. We are unable to find, however, that any such term was incorporated into the final documents. The stock acquisition agreement explicitly provides that it constitutes the entire agreement of the parties.

Finally, the relative proportion of the amount assigned to the stockholders' equity and the noncompete payments has not been proven to be unreasonable. Conquest started as an undercapitalized entity a relatively short time before the agreements, and Jerry and Walker's efforts increased Conquest's value at the time of sale. We are convinced that restricting competition from Walker and Jerry had substantial value when the stock acquisition agreement was signed and that the noncompete protection was in fact of greater value than the other assets of the business. Accordingly, we find that the payments made pursuant to the noncompete agreement are ordinary income to petitioners.

Alternative Argument

Petitioners argue alternatively that events in 1989 established a new agreement under which the noncompete payments petitioners received in 1993 and 1994 are taxed at capital gains

rates.  As was true with the primary argument, we are unpersuaded by this alternative argument.

The noncompete agreement generally restricted Jerry from disclosing information confidential to Conquest and prohibited him from directly or indirectly competing with Conquest.  An exception to the general restrictions, subject to conditions, was made to accommodate Jerry's involvement with Mattel.  The general restriction applied to Jerry's S corporation, TSI.  It also applied to Hawk Extrusions, Inc., provided that Hawk did not compete with Conquest in the production of bulk continuous yarn.

Petitioners argue that the change of ownership in Mattel and the release of Jerry's covenant not to compete as to Mattel constituted a new agreement.  Although we agree that the terms of the stock acquisition and noncompete agreements were modified in 1989, we disagree that those modifications changed the proper characterization of the payments petitioners received pursuant to the noncompete agreement.  The express language of the agreement under which Ralston acquired an ownership interest in Mattel (purchase agreement) indicates that the parties intended the Jerry noncompete agreement would remain in force except as modified by the purchase agreement.[7]  The latter agreement stated

---

[7] Jerry was aware of the terms of the purchase agreement. The purchase agreement was signed by Ronald, Ralston, and Jerry on behalf of Mattel.

that Ralston would cause Jerry's noncompete agreement with Conquest to be <u>modified</u> in such a manner that his participation in Mattel and other incidental matters would not be a violation of the noncompete agreement.  The explicit acknowledgment that the noncompete agreement needed to be modified (rather than abandoned or released) to remove restrictions on Mattel's competing with Conquest is probative that the noncompete agreement survived.  In fact, after Mattel's ownership change, Jerry was still restricted from competing with Conquest other than through Mattel, and he continued to be restricted from disclosing Conquest's confidential information.  We conclude that the noncompete agreement survived and that the payments received by Jerry continued to be taxed as ordinary income.

On the basis of the entire record, we conclude that the allocation contained in the stock acquisition and noncompete agreements was bargained for by the parties, that no party was indifferent to the allocation,[8] that the allocation reflects the parties' intent when the agreements were signed, and that the allocation has sufficient "economic reality" to be respected for tax purposes.

---

[8] The sellers were represented by counsel during the negotiation of the stock acquisition agreement.

III.  Accuracy-Related Penalties

Respondent argues that petitioners are liable for the 1993 and 1994 accuracy-related penalties determined under section 6662(a) for, among other things, negligence and intentional disregard of rules or regulations.  Petitioners focus on the portion of the accuracy-related penalty attributable to Jerry's trading of securities and argue that they exercised ordinary care in the handling of their tax affairs by hiring accountants to report those affairs correctly.

Section 6662(a) and (b)(1) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations.  Negligence includes a failure to attempt reasonably to comply with the Code.  Sec. 6662(c).  Disregard includes a careless, reckless, or intentional disregard.  Id.  An underpayment is not attributable to negligence or intentional disregard to the extent that the taxpayer shows that the underpayment is due to the taxpayer's having reasonable cause and acting in good faith.  Secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.

Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item.  United States v. Boyle, 469 U.S. 241 (1985); see also Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000).  The

good faith, reasonable reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. United States v. Boyle, supra; sec. 1.6664-4(b), Income Tax Regs. Whether a taxpayer relies on advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law applicable thereto. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. The taxpayer must prove that: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Rule 142(a)(1).

We are unable to conclude that petitioners have met that burden of proof. Whereas they assert on brief that they relied reasonably upon their accountant, we do not find that such was the case. Petitioners had actively traded securities for several years preceding the subject years and reported capital gains from securities transactions in 1991 and 1992, including a net capital gain of over $600,000 in 1992. Although neither the law nor the nature of their securities activity changed materially in the following 2 years, their reporting position as to that activity changed from capital loss to ordinary loss treatment. The record is barren of any credible evidence showing that petitioners ever

received, let alone reasonably relied upon, any competent professional advice concerning that reporting change.  In fact, the accountant's own testimony indicates that he lacked sufficient knowledge to render competent advice on the subject.  We are unpersuaded that petitioners lacked sophistication in tax matters.

We also disagree with petitioners' assertion that the accuracy-related penalties generally relate to the "unsettled" law on day trading.  The law in this area has been well settled for many years in that courts have consistently held that a sale of securities may result in ordinary losses only when the securities are held primarily for sale to customers in the ordinary course of business.  Bielfeldt v. Commissioner, T.C. Memo. 1998-394 (and cases cited therein), affd. 231 F.3d 1035 (7th Cir. 2000).  Petitioners, by contrast, traded solely for their own account and never held securities primarily for sale (or actually sold securities) to customers in the ordinary course of a trade or business.  We conclude that petitioners are liable for the accuracy-related penalties determined by respondent, except as otherwise conceded by respondent.

All arguments made by the parties and not discussed herein have been rejected as meritless.  Accordingly,

Decision will be entered

under Rule 155.